AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Western District of New York

FILED
JUN 0 3 2017
MARY C. LOEWENGUTH, CLERK
WESTERN DISTRICT OF NY

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>207 LEIGHTON AVENUE, ROCHESTER, NEW YORK<br>(Premise 1) | )<br>)<br>)<br>)<br>)<br>) | Case No.  17 mj 576 |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

207 LEIGHTON AVENUE, ROCHESTER, NEW YORK (Premise 1), as further described in Attachment A.

located in the _____Western_____ District of _____New York_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Schedule of Items to be Seized (attached hereto as Exhibit B).

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 846 | Conspiracy to commit a controlled substance offense |
| 18 U.S.C. § 1956(h) and 1957; | Money laundering offenses |
| 18 U.S.C. § 924(c) | Unlawful possession of a firearm in furtherance of a drug trafficking crime |

The application is based on these facts:

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Christopher Mahaffy, Special Agent, DEA
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  6 3 17

_____
*Judge's signature*

City and state:  Rochester, New York

JONATHAN W. FELDMAN, U.S. Magistrate Judge
*Printed name and title*

## Attachment A – Premise 1

**Premise 1 (207 Leighton Avenue, Rochester, New York)** is a light grey colored, two and a half story building located on the south side of Leighton Avenue near the intersection of Culver Avenue in Rochester, New York. The building is a split residence with 207 Leighton Avenue occupying the eastern side of the building and 205 Leighton Avenue occupying the western side of the building. The number "207" is located in black on the outside of the semi-enclosed front porch on the eastern side of the residence. 207 Leighton Avenue has a white front door that faces north and a driveway on the eastern side of the residence. On March 24, 2017, the DEA Rochester Resident Office completed a utilities check of **Premise 1** and determined that Sam DIFRANCESCA was listed on the account since January 4, 2016. It should be noted that DIFRANCESCA had three active accounts at the time of the search. At this time, your affiant does not believe that **Premise 1** is the permanent address for CONCEPCION or DIFRANCESCA.

**Attachment B**

Items to be seized:

a) Address and/or telephone books and papers reflecting names, addresses and/or telephone numbers;

b) Indicia of occupancy, residency, or ownership of the subject premises and things described in this warrant, including utility bills, telephone bills, loan payment receipts, rent receipts, trust deeds, lease or rental agreements, escrow documents, canceled envelopes and keys, whether such items are stored in documentary or electronic form;

c) Proceeds of narcotics violations including United States currency, precious metals, jewelry and financial instruments;

d) Narcotics and narcotic paraphernalia;

e) Photographs, in particular, photographs of co-conspirators, of assets, of weapons, and/or of controlled substances, and other documents identifying associates and co-conspirators;

f) Indicia of drug trafficking, including, but not limited to, scales, cutting agents, cutting tools, drug paraphernalia for processing and packaging and/or distributing controlled substances;

g) Any evidence related to possession of weapons and/or firearms, including but not limited to revolvers, semi-automatic pistols, rifles, and ammunition;

h) United States currency;

i) Cellular telephones; and

j) Any locked or closed containers believed to contain or be able to contain any of the above listed items.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

IN THE MATTER OF THE SEARCH OF
THE PREMISES AT:

207 LEIGHTON AVENUE, ROCHESTER, NEW YORK (**Premise 1**);
60 TYLER STREET, ROCHESTER, NEW YORK (**Premise 2**);

17-MJ- *573*
*574*
*575*
*576*

IN THE MATTER OF THE SEARCH OF
THE VEHICLES:

2004 FORD EXPEDITION, NEW YORK STATE REGISTRATION HGB-8123 WITH
VIN NUMBER 1FMPU16L44LB736752007 (**Vehicle 1**);
2009 CHEVROLET TRAVERSE, NORTH CAROLINA REGISTRATION EKB-4629
WITH VIN NUMBER 1GNER23D79S171942 (**Vehicle 2**);

UNITED STATES OF AMERICA

            v.

KEVIN CONCEPCION and
TIGIST DEMISSIE,

                Defendants.

## AFFIDAVIT IN SUPPORT OF SEARCH & SEIZURE WARRANTS
## AND CRIMINAL COMPLAINTS

**CHRISTOPHER MAHAFFY, being duly sworn, deposes and states:**

1.     Your affiant is a Special Agent with the United States Department of Justice,

Drug Enforcement Administration (DEA), assigned to the New York Field Division,

Rochester Resident Office.  I have been employed as a DEA Special Agent since May 4,

2014.  Prior to being a DEA Special Agent, I received a Bachelor's of Arts in Public Justice

from the State University of New York at Oswego in May 2007.  My primary duties as a

–1–

DEA Special Agent include investigating violations of federal drug laws such as individuals engaged in illegal drug trafficking, unlawful possession of drugs, as well as the possession of firearms during the commission of drug trafficking crimes, and money laundering offenses.

2. During my tenure with DEA, I have participated in numerous investigations relating to armed individuals that were involved in the distribution of controlled substances, including heroin, cocaine, cocaine base and other substances, in violation of federal drug laws, including Title 21, United States Code, Sections 841 and 846, and Title 18 United States Code, Sections 922 and 924. I have also participated in numerous interviews and debriefings of individuals involved in armed drug trafficking. I am familiar with the habits, methods, routines, practices and procedures commonly employed by persons engaged in the armed trafficking of illegal drugs. Additionally, I am familiar with the methods of use, effects, distribution, appearance, as well as the methods of manufacture of controlled substances. I have been the affiant on multiple federal and state search warrants, arrest warrants and other applications. During my time at the Rochester Resident Office, I have participated in three long-term narcotics investigations that utilized the court-authorized interception of wire communications that have resulted in the arrest of drug distributors, and the seizures of quantities of controlled substances and firearms. In addition, I have had the opportunity to work with other DEA agents and law enforcement officers, who have also investigated armed drug trafficking networks.

3.     This affidavit is made in support of applications for search warrants for the premises located at: 207 Leighton Avenue, Rochester, New York (**Premise 1**) and 60 Tyler Street, Rochester, New York (**Premise 2**).

4.     This affidavit is also made in support of applications for search warrants for the following vehicles: a 2004 Ford Expedition, New York State registration HGB-8123 with vin number of 1FMPU16L44LB73675 (**Vehicle 1**) and a 2009 Chevrolet Traverse, North Carolina registration EKB-4629 with vin number of 1GNER23D79S171942 (**Vehicle 2**).

5.     This affidavit is made in support of search warrants for the above-listed premises and vehicles for fruits, records, instrumentalities and evidence of violations of Title 21, United States Code, Section 841(a)(1) (unlawful possession with intent to distribute of heroin, cocaine and cocaine base); Title 21, United States Code, Section 846 (conspiracy to possess with intent to distribute and distribute heroin, cocaine and cocaine base); Title 18, United States Code, Section 924(c)(1) (unlawful possession of a firearm in furtherance of a drug trafficking crime); and Title 18, United States Code Sections 1956 and 1957 (money laundering offenses).

6.     This affidavit is also submitted in support of criminal complaints charging KEVIN CONCEPCION and TIGIST DEMISSIE with violations of Title 21, United States Code, Sections 846 and 841(a)(1).

7.     As a result of my personal participation in this investigation, thorough analysis of documents and records obtained by DEA agents, Rochester Police Department ("RPD") Investigators, agents of the Charlotte, North Carolina Resident Office of Homeland Security Investigations, agents of the Criminal Investigation Division of the Internal Revenue Service ("IRS"), members of the Greater Rochester Area Narcotics Enforcement Team ("GRANET"), agents of the Rochester Resident Office of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), and other law enforcement officers, information provided by confidential informants, the basis of whose knowledge and reliability will be described below, information learned through subpoenaed telephone tolls and other records, information gathered through the use of physical surveillance and electronic surveillance to include covert pole cameras, and information gathered from a court-authorized GPS tracking device on **Vehicle 2**, I am familiar with all aspects of this investigation.   Since this affidavit is being submitted for limited purposes, I have not included each and every fact known to me concerning this investigation.   Rather, I have set forth only the facts that I believe are necessary to establish the required foundation for the requested warrants and those facts that relate to the issue of whether probable cause exists to believe that the above-named defendant committed the above-mentioned offenses.

## BACKGROUND

8.     Kevin CONCEPCION is 34 years old.  His criminal history includes:  (1) a 2003 misdemeanor conviction for Sexual Misconduct in Erie County Court, New York, for which he received a sentence of 6 years probation; (2) a 2006 felony conviction for Criminal

Possession of a Loaded Firearm in the 3rd Degree in Monroe County Court, New York, for which he received a 42 month prison term; and (3) a 2014 felony conviction in the Court of Common Pleas of Wood County, Ohio, for Trafficking in Drugs for which he received a sentence of 5 years probation, with 6 months to be served in jail. He is registered as a sex offender in Iredell County, North Carolina, the county of his current residence.

9.      In March of 2016, investigators learned from reliable confidential sources that CONCEPCION was again dealing drugs. After corroborating the information, plans were made to make controlled purchases of narcotics from CONCEPCION.

## PRIOR APPLICATION IN INVESTIGATION

10.     On September 1, 2016, the Honorable Marian W. Payson, United States Magistrate Judge, Western District of New York ("WDNY"), issued an order (16-MJ-4113) authorizing agents of the DEA to obtain all location and cell site data for the cellular telephone assigned call number (704) 657-6374, utilized by Kevin CONCEPCION, over a period of thirty (30) days. Monitoring pursuant to that warrant ended on October 1, 2016.

11.     On May 2, 2017, the Honorable Marian W. Payson, United States Magistrate Judge, Western District of New York, issued an order (17-MJ-4044) authorizing agents of the DEA to install and monitor a tracking device on **Vehicle 2** over a period of forty-five (45) days. This order was amended by the Honorable Marian W. Payson, United States Magistrate Judge, WDNY, on May 3, 2017. The amended order was executed on the morning of May 5, 2017, and is currently being monitored.

## MAINTENANCE OF EVIDENCE

12.     Based on my training, experience, and participation in this and other drug trafficking and money laundering investigations, and based upon my discussions with other experienced DEA agents, and federal, state, and local drug investigators, I know that:

a.  Traffickers of controlled substances frequently maintain, at their residence, place of business or inside their vehicles, quantities of cocaine, crack cocaine, heroin, marijuana and/or other illicit drugs to maintain their ongoing drug business;

b.  In addition to drugs, traffickers of controlled substances usually keep, at their residence, place of business or inside their vehicles, paraphernalia for the packaging, diluting, cutting, weighing, processing and distributing of controlled substances, including scales, plastic bags, cutting agents and utensils;

c.  Traffickers of controlled substances commonly keep firearms in their homes, vehicles, and businesses to protect themselves, their narcotics, and the proceeds from their narcotics sales, and I am aware that many courts, including the Second Circuit United States Court of Appeals, have found that weapons and firearms are among the "tools of the trade" in the narcotics business;

d.  In addition to firearms, traffickers of controlled substances commonly possess and maintain ammunition, body armor, firearm cleaning kits, scopes, stocks, holsters, and manufacturer's firearm cases on their person, or in their homes or vehicles or businesses;

e.  Traffickers of controlled substances commonly maintain records, notes, and other papers relating to drug trafficking, some of which may be in code, including but not limited to sales receipts, shipping labels, shipping receipts, shipping boxes, order forms, storage receipts, records, operating manuals, computer records, publications, notes, checks, money orders, and money transfer receipts. The aforementioned records, notes, and other papers are commonly maintained where the drug possessor/trafficker has ready access

–6–

to them, such as on their person, or in their homes, vehicles or businesses, or even in electronic storage devices, including, but not limited to computers, computer storage devices, tablets, and cellular telephones;

f.   Traffickers of controlled substances commonly maintain records, books or papers that reflect addresses or telephone numbers for their associates or sources of supply and such items may be in code.  The above addresses may also be stored in electronic storage mediums, including but not limited to cellular telephones, computers, and computer storage devices;

g.   Traffickers of controlled substances commonly take, or cause to be taken, photographs/videos of themselves, their associates, their property, their drugs, or their firearms, and usually maintain these photographs/videos in their residences.   The above photographs/videos may also be stored in electronic storage mediums, including but not limited to cellular telephones, digital cameras, tablets, home computers, and computer storage devices;

h.   Traffickers of controlled substances commonly maintain cellular telephones and other communication devices on their person, in their residences, in their vehicles, and in their businesses, that are utilized to further their firearm and drug trafficking activities, including contacting other individuals that they are involved in drug trafficking activities with; certain electronic devices, including i-Phones, Blackberries, i-Pods, and Android phones, store information such as email messages, chats, multimedia messages, installed applications or other electronic communications, calendars, notes, passwords, dictionary entries, Global Positioning Satellite ("GPS") entries, internet protocol connections, and location entries, including cell tower and WiFi entries, internet or browser entries, or history.  In addition, these devices often contain proprietary software, in the form of system, data, or configuration information, which enable the types of information and data described above to be accessed and analyzed.  These items remained stored on the electronic devices even if the device in question has lost all battery power, and has not been used for an extended period of time;

i.   Traffickers of controlled substances commonly keep and utilize personal computers and tablets to further their drug trafficking activities.  The use of personal computers and tablets by drug traffickers, as well as by the general public, has increased dramatically during the past several years.  During the past three years alone, myself and/or other members of the investigative team

have participated in investigations where computers, tablets and cellular telephones were seized and searched pursuant to court-authorized search warrants that contained digital photographs of drugs, firearms, and bulk cash, as well as text messages indicating locations of drug transactions. I am also familiar with the fact that the search, retrieval, analysis, documentation and authentication of all such electronically stored computer data (to include cellular telephones) requires analysis by a qualified computer specialist to prevent the loss of data either from accidental or deliberate destruction;

j. Traffickers of controlled substances commonly maintain their drugs or firearms in a secured location, including but not limited to safes, safe deposit boxes, vaults, or hidden compartments in their residences, vehicles, businesses or financial institutions;

k. Traffickers of controlled substances must maintain, on hand, United States currency in order to maintain and finance their ongoing drug business and the cash proceeds of drug trafficking often contain traces of the narcotics sold or bought by the drug dealers;

l. Traffickers of controlled substances commonly hide contraband; proceeds of drug sales, including currency, financial instruments, precious metals, jewelry, and other items of value; and records of drug transactions, drug sources, and drug customers in secure locations within their residences, vehicles, safe deposit boxes, businesses and storage areas for ready access and to conceal such items from law enforcement authorities;

m. When traffickers of controlled substances amass large proceeds from the sale of drugs, they attempt to legitimize these profits by utilizing banks, and their attendant services: securities, cashiers checks, money drafts, letters of credit, brokerage houses, real estate, and business fronts, among other things;

n. Traffickers of controlled substances often place assets in names other than their own to avoid detection of those assets by government agencies while continuing to use those assets and exercise dominion and control over them;

o. Traffickers of controlled substances often seem to live above their means and I am aware that courts have recognized that unexplained wealth is probative evidence of crimes motivated, at least in part, by greed, and in particular, trafficking in controlled substances;

–8–

p. Drug traffickers utilize U. S. currency (cash) as the method of conducting their illegal activity;

q. The sale of illegal drugs can generate large quantities of cash and often involve small denomination bills, such as $5, $10, $20, and $50 bills, which are commonly referred to as "street money;"

r. Drug traffickers are motivated by the profits that can be generated in the sale of drugs, which they use to enhance their lifestyle or recognition in the community through the purchase of personal assets, including automobiles;

s. Drug traffickers often do not maintain personal bank accounts because such accounts will generate a record of their cash deposits, which records can identify that the individual is involved in some form of illegal activity. Therefore, drug traffickers often use the raw "street cash" to purchase personal assets, such as automobiles;

t. Drug traffickers often cannot rely on checks or credit to purchase assets, such as cars, because such instruments leave trails which are unfavorable to their illegal activity. Therefore, drug traffickers often use their cash proceeds when purchasing assets;

u. The conversion or disposition of large amounts of cash at financial institutions is problematic for drug traffickers due to banks' currency reporting requirements;

v. Drug traffickers spend their cash drug proceeds in a manner designed to hinder law enforcement's detection of the assets acquired, such as an automobile. They commonly use various money laundering schemes to accomplish this goal;

w. Money laundering is the "washing" of illegal proceeds (cash) in order to disguise its true source, i.e., to conceal the underlying illegal activity by which the proceeds were generated. Often times drug traffickers set up businesses as a "front," usually in someone else's name, to launder their drug proceeds through to give the appearance that the money is generated from a legitimate business;

x.  The U.S. government has attempted to combat and identify the laundering of cash by individuals involved in illegal activities, such as drug trafficking, and to discourage those businesses, such as automobile dealerships and casinos, who willingly accept large amounts of cash, by imposing requirements to file Forms 8300 documents and Currency Transaction Reports ("CTR") with the Financial Crimes Enforcement Network ("FinCEN") and the Internal Revenue Service;

y.  The Currency Transaction Report (also known as FinCEN Form 104) is required to be filed by financial institutions (i.e. banks) when a customer conducts a transaction involving more than $10,000 cash. The Currency Transaction Report by Casinos ("CTRC"), which is also known as FinCEN Form 103, is required to be filed by casinos when a customer conducts a transaction involving more than $10,000 cash;

z.  FinCEN Form 8300, "Report of Cash Payments Over $10,000 Received in a Trade or Business," is required to be filed by a trade or business (i.e. car dealers, etc.) upon the receipt of more than $10,000 cash from a customer;

aa. Both the CTRC and Form 8300 cause tremendous problems for individuals when they attempt to spend amounts of illegally-obtained cash in amounts exceeding $10,000, in that the forms are required by law to be filed with the IRS and FinCEN and must identify both the person who paid the cash and the individual on whose behalf the transaction was conducted;

bb. Individuals involved in illegal activities attempt to evade or avoid the filing of CTR's and Form 8300's because these forms create a "paper trail" which can be used by law enforcement as evidence to convict those involved in criminal activity and those who laundered the proceeds.

## NO-KNOCK AND NIGHTTIME REQUEST

13.    I respectfully request that a search warrant for **Premise 1**, authorize the agents/officers on the search team to enter the Premise without first knocking and announcing their presence. In this particular case, I believe that requiring the officers to first

knock and announce their presence would allow the occupants of the Premise an opportunity dispose of or destroy illegal controlled substances and/or reach for weapons to use against law enforcement officers.

14.     The basis of my "No-Knock" request is as follows:

a.      Controlled substances are easily and readily disposed of or destroyed. Cocaine and heroin generally comes in powder or base (crack cocaine) form and valuable quantities of cocaine and heroin are not particularly large or bulky. Cocaine and heroin traffickers often attempt to dispose of controlled substances by flushing it down the toilet, or sending it down the drain, either within packaging or not, when they are aware of police intent to execute a search warrant;

b.      Moreover, drug traffickers often attempt to flee and/or destroy, carry away, or hide cocaine, heroin, proceeds of drug sales, records, and other evidence upon learning of law enforcement intent to question, search, or arrest;

c.      Drug traffickers often attempt to fortify or barricade locations where they store and distribute controlled substances, as well as locations where they keep proceeds of drug sales. Drug traffickers frequently utilize surveillance cameras in those locations as well. These measures serve to protect the drugs and proceeds from the police and individuals seeking to steal them, by attempting to prevent or delay entry into the location and providing notice of the police presence. The delayed entry and advance notice provide an opportunity to those inside the Premises to destroy evidence, flee, and/or arm themselves with weapons.

–11–

d.    Most importantly, drug traffickers frequently protect themselves, their drug product and/or their drug proceeds with firearms.    Armed drug traffickers usually keep their firearms in an area readily accessible to the occupants of the premise.    The firearms are often carried either on the individuals' person or within an arms-length reach of the occupants.  If law enforcement is required to knock and hesitate, it would allow the occupants an opportunity to observe who is coming and potentially arm themselves. This could create an ambush situation for law enforcement officers.

e.    In this case, it is believed that the occupants of **Premise 1** are in possession of firearms in order to protect themselves, their drug product, and their drug proceeds.  For example, on January 17, 2017, at approximately 12:36 a.m., CONCEPCION was documented on a pole camera positioned in the vicinity of 271 Central Park, Rochester, New York[1] (hereafter the "Central Park residence"), exiting the location carrying a black object consistent in size and shape with a handgun, as well as a plastic bag.  This event is described in greater detail below in Paragraph 22.  CONCEPCION was then documented on the pole camera at approximately 12:38 a.m. returning to the Central Park location carrying the handgun.  Screenshots obtained from the pole camera on this date are attached hereto as Exhibit 1.

15.    Your affiant additionally requests that the search warrant for **Premises 1 and 2** authorize the agents/officers on the search team to enter the Premises at any time of the day or night.  In this particular case, the investigation has revealed that the business of this conspiracy is conducted at all hours of the day and that good cause exists for nighttime execution pursuant to Federal Rule of Criminal Procedure 41.  For example, as detailed in

---

[1]    271 Central Park, Rochester, New York, is known to your affiant as a former stash location for Kevin CONCEPCION.  CONCEPCION ceased using this address near the end of January 2017.

Paragraphs 31 through 34, members of the conspiracy have been known to operate in the late night hours.

16.     During the course of this investigation, the investigative team has determined that the members of this narcotics conspiracy frequently transport drugs and drug proceeds in vehicles. Agents have observed CONCEPCION conducting his drug trafficking during the day and late at night. Agents have observed individuals going inside **Premise 1** during the late night hours and, after staying a short period of time, leaving the area. Based on my training and experience this activity is consistent with narcotics trafficking. During these observations, agents were contacted by CS-1 (described in paragraph 17) and told that CONCEPCION was inside packaging and distributing heroin to customers.

## Purchases of Heroin

17.     In the beginning of August 2016, the DEA Rochester Resident Office and the Greater Rochester Area Narcotics Enforcement Team ("GRANET") utilized a GRANET confidential source (hereafter "CS-1")[2] to purchase a quantity of heroin greater than a half an ounce, but not more than an ounce, from Kevin CONCEPCION. GRANET Investigator Phil Genier and Special Agent Sabatino Smith met with CS-1 to formulate a plan to have CS-1 make a controlled purchase of heroin from CONCEPCION. CS-1

---

2     Your affiant states that CS-1 is personally known to members of the DEA and GRANET. CS-1 has given GRANET Investigator Phil Genier reliable information in the past, relative to narcotics trafficking and illegal firearms, which has been independently corroborated and has led to controlled purchases of controlled substances and the seizure of multiple firearms. CS-1's identity is being withheld from this affidavit to protect him/her from retaliation and to further utilize him/her in this and future investigations.

contacted CONCEPCION on a telephone number provided to him days earlier by CONCEPCION for the purposes of contacting him to purchase narcotics. CS-1 did contact CONCEPCION and, in sum and substance, they agreed to meet at 271 Central Park, Rochester, New York. Investigator Genier and Special Agent Smith searched CS-1 and his/her vehicle which yielded negative results for contraband. The controlling agents then provided CS-1 with a predetermined amount of U.S. Currency.[3] At approximately 1:00 p.m. on this same date, surveillance was established in the vicinity of the 200 block of Central Park, Rochester, New York. At the direction of Investigator Genier and Special Agent Smith, CS-1 met with CONCEPCION at the Central Park residence, in the upstairs apartment on this same date. While inside the Central Park residence, CONCEPCION provided CS-1 with a previously agreed upon quantity of heroin, greater than a half an ounce but less than an ounce, before CS-1 departed the location and traveled back to a pre-determined neutral location. CS-1 was under constant surveillance from surveillance agents as he/she traveled to and from the vicinity of the Central Park residence and was observed entering and exiting the Central Park residence. Upon arrival at the neutral location, CS-1 immediately provided Special Agent Smith and Investigator Genier a plastic bag of suspected heroin. At this time, Special Agent Smith and Investigator Genier again searched CS-1 and his/her vehicle for contraband and weapons with negative results. The suspected heroin was field tested and the result was positive for the presence of heroin. During a debriefing, CS-1 informed the controlling agents that he/she observed a handgun in plain sight in the upstairs apartment of the Central Park residence. CS-1 also informed the

---

3    The exact amount of heroin purchased and the amount of currency provided for the purchase is being withheld to protect the identity of CS-1.

controlling agents that at the time CONCEPCION provided CS-1 with the heroin purchase, CONCEPCION was attired in a medical mask obscuring his nose and mouth, consistent with attire utilized when handling and packaging heroin for distribution.

18.     In the middle of August 2016, the DEA Rochester Resident Office and GRANET utilized CS-1 to purchase a quantity of heroin greater than a half an ounce, but not more than an ounce, from Kevin CONCEPCION.  GRANET Investigator Phil Genier and Special Agent Sabatino Smith met with CS-1 to formulate a plan to have CS-1 make a controlled purchase of heroin from CONCEPCION.  CS-1 did contact CONCEPCION on a different phone number than the one referenced in Paragraph 17 that CONCEPCION provided to CS-1 a few days earlier to contact him on to purchase heroin.  CS-1 stated that CONCEPCION informed him/her that he was going to be in the Rochester, New York area for only a few days.  In sum and substance, they agreed to meet on Clifford Avenue, Rochester, New York.  Investigator Genier and Special Agent Smith searched CS-1 and his/her vehicle which yielded negative results for contraband.  The controlling agents then provided CS-1 with a predetermined amount of U.S. Currency.[4]  At approximately 1:50 p.m. on this same date, surveillance was established in the vicinity of the intersection of Clifford Avenue and Cummings Street, Rochester, New York.  At the direction of Investigator Genier and Special Agent Smith, CS-1 met with CONCEPCION on Cummings Street near the Clifford Avenue intersection.  Special Agent William Reichard

---

4     The exact amount of heroin purchased and the amount of currency provided for the purchase is being withheld to protect the identity of CS-1.

observed CONCEPCION travel on foot down Cummings Street from the vicinity of 163

Cummings Street, reposition a 2004 grey Ford Expedition with NY Tag# HGB-8123

(**Vehicle 1**) and then enter the passenger side of CS-1's vehicle. While inside CS-1's

vehicle, CONCEPCION provided CS-1 with a previously agreed upon quantity of heroin,

greater than a half an ounce but less than an ounce, before CONCEPCION exited CS-1's

vehicle and departed the area in **Vehicle 1**. CS-1 then departed the location and traveled

back to a pre-determined neutral location. CS-1 was under constant surveillance from

surveillance agents as he/she traveled to and from the intersection of Clifford Avenue and

Cummings Street, Rochester, New York. Upon arrival at the neutral location, CS-1

immediately provided Special Agent Smith and Investigator Genier a plastic bag of

suspected heroin. At this time, Special Agent Smith and Investigator Genier again

searched CS-1 and his/her vehicle for contraband and weapons with negative results. The

suspected heroin was field tested and the result was positive for the presence of heroin.

### Pole Camera Surveillance of 271 Central Park, Rochester, New York, on September 12, 2016

19. Special Agent Christopher Mahaffy reviewed footage from a pole camera

positioned in the vicinity of 271 Central Park, Rochester, New York, for the date of

September 12, 2016. On this same date, at approximately 2:48 p.m., a male later identified

as Mikel STRONG (date of birth 12/12/1950) opened the door of the Central Park

residence from the interior. An unidentified male (hereafter "UM1") exited the Central

Park residence carrying a Hennessey liquor box. Special Agent Mahaffy then observed

CONCEPCION approach the door of the Central Park residence from the interior stairwell.

–16–

CONCEPCION was attired in a black t-shirt and black pants with white plastic gloves. The pole camera footage showed CONCEPCION remove a blue surgical mask as he approached the door from the stairwell. CONCEPCION conversed with UM1 briefly before UM1 departed and CONCEPCION and STRONG returned to the Central Park residence. It should be noted that during the controlled purchase of heroin in the beginning of August 2016, as referenced above in Paragraph 17, CS-1 observed CONCEPCION in a medical mask at the Central Park residence. Photographs from the pole camera of CONCEPCION taking off the mask as he approached the door of 271 Central Park and CONCEPCION standing in the doorway wearing the plastic gloves are attached hereto as Exhibit 2.

### Confidential Source Information Regarding CONCEPCION's Drug Trafficking Organization in December 2016

20.     During the month of December 2016, Special Agent Sabatino Smith and Special Agent Christopher Mahaffy met with a Homeland Security Confidential Source (hereafter "CS-2").[5] Special Agent Smith and Special Agent Mahaffy formulated a plan for CS-2 to meet with CONCEPCION to discuss future narcotics trafficking. CS-2 contacted CONCEPCION via telephone and CONCEPCION directed CS-2 to meet him at 271 Central Park, Rochester, New York. Special Agent Smith observed CS-2 entering the Central Park residence with CONCEPCION via pole camera surveillance. While inside the

---

5     Your affiant states that CS-2 is personally known to members of the DEA and Homeland Security. CS-2 has given HSI Investigator James Bryant reliable information in the past relative to narcotics trafficking and illegal firearms, which has been independently corroborated and has led to multiple seizures of controlled substances, guns, and drug proceeds. CS-2's identity is being withheld from this affidavit to protect him/her from retaliation and to further utilize him/her in this and future investigations.

−17−

Central Park residence, CS-2 observed an AK-47 assault rifle, 9mm pistol, a revolver, a kilogram of cocaine bearing a Rolex symbol, and a kilogram of heroin. At the conclusion of the meeting and prior to departing the Central Park residence, CS-2 observed CONCEPCION take possession of the cocaine and heroin and place them in a bag. Additionally, CONCEPCION took possession of a pistol and departed the Central Park residence. CS-2 observed CONCEPCION walk to and open the driver's side door of **Vehicle 1** and place the bag inside. CONCEPCION and CS-2 then departed the area in another vehicle. CS-2 stated that he/she observed CONCEPCION manipulating the middle console area of **Vehicle 1** while he was placing the bag inside **Vehicle 1**.

## Confidential Source Information and Pole Camera Surveillance of 271 Central Park, Rochester, New York on January 16, 2017

21.     On January 16, 2017, GRANET Investigator Genier was contacted by CS-1. In sum and substance, CS-1 stated that CONCEPCION was at the Central Park residence distributing quantities of cocaine. On this same date, at approximately 4:00 p.m. and again at approximately 5:30 p.m., Special Agent Mahaffy physically observed a white 2015 Ford Transit T-350 with NC Tag# DLL-8647 (hereafter the "white Ford van") parked on First Street north of the Central Park intersection in Rochester, New York. The white Ford van was previously determined to be registered to CONCEPCION. Additionally, an anonymous tip provided to the Rochester Police Department on December 29, 2015, stated that a "white party van" with a North Carolina license plate was being utilized by "Kevin" to distribute narcotics in Rochester, New York. The tip further stated at the time that the bus had approximately $60,000 in cash on board, as well as kilograms of narcotics hidden in

door panels.  On January 17, 2017, Special Agent Mahaffy reviewed footage of a pole camera positioned in the vicinity of the Central Park residence from the previous day and observed CONCEPCION frequenting the Central Park residence between approximately 11:20 a.m. on January 16, 2017, and 12:38 a.m. on January 17, 2017.  At approximately 12:36 a.m. on January 17, 2017, CONCEPCION was observed exiting the Central Park residence with two plastic bags in his left hand and an unknown black object in his right hand.  At approximately 12:38 a.m., CONCEPCION was observed returning to the Central Park residence without the bags, but still holding a black object in his right hand.  The black object was determined to be consistent in size and shape with and appeared to be a handgun.

## Arrest of Nathaniel GATES in Dunkirk, New York on February 7, 2017

22.    During a debriefing on August 9, 2016, SA Smith spoke with CS-3[6] regarding the drug trafficking activities of Kevin CONCEPCION.  During this debriefing, CS-3 stated that Nathaniel GATES was an enforcer and dealer for CONCEPCION.  In the month of August 2016, agents completed a records search and confirmed that CONCEPCION had continued to rent a 2016 Town and Country minivan from Enterprise in Hornell, New York, with the most recent rental being listed as July 22, 2016, for 30 days.  Nathaniel GATES was listed as an additional driver on the rental agreement.

---

6      Your affiant states that CS-3 is personally known to members of the DEA and GRANET.    CS-3 has given SA Sabatino Smith and TFO Timothy Pearce reliable information in the past relative to narcotics trafficking and illegal firearms, which has been independently corroborated and has led to multiple seizures of controlled substances, guns, and drug proceeds.  CS-3's identity is being withheld from this affidavit to protect him/her from retaliation and to further utilize him/her in this and future investigations.

23.     On February 7, 2017, GATES was arrested in Dunkirk, New York, and his residence of 90 Brigham Road, Apartment 17, Fredonia, New York, was searched. Agents from the DEA Buffalo District Office and the Southern Tier Regional Drug Task Force (hereafter "STRDTF") located approximately 157 gross grams of cocaine, 32 gross grams of crack cocaine, and 113 gross grams of heroin during the execution of the search warrant of 90 Brigham Road, Apartment 17, Fredonia, New York.[7]   Agents also seized $1,668 in United States currency during the execution of the search warrant.

24.     Since GATES' arrest, agents have obtained several recorded jail calls between GATES and an unknown female believed to be GATES' paramour.  During these calls, GATES directs the unknown female to place an additional call in a conference call style to Kevin CONCEPCION, in order for GATES and CONCEPCION to speak discreetly. Based on SA Smith's history with CONCEPCION, SA Smith is familiar with CONCEPCION's voice and positively identified CONCEPCION during these phone calls. In sum and substance, GATES and CONCEPCION discuss the status of GATES' arrest and CONCEPCION stated several times that CONCEPCION will contact an attorney previously used by CONCEPCION.

### Confidential Source Information and Pole Camera Surveillance of 207 Leighton Avenue, Rochester, New York

25.     In March of 2017, CS-1 informed investigators that CONCEPCION had obtained a new stash location on Leighton Avenue in Rochester, New York.  This information was later corroborated through surveillance and a pole camera was established

---

7       The exact weights of the drug exhibits were unavailable at the time of this writing.

in the vicinity of the new stash location, located at 207 Leighton Avenue, Rochester, New York (**Premise 1**).

26.     While reviewing pole camera footage from March 31, 2017, your affiant observed a gray Ford Expedition consistent in color, model year, and all other aspects to **Vehicle 1** arrive at **Premise 1** at approximately 8:38 p.m. on that same date and remain stationary overnight. Due to darkness and the position of the vehicle, your affiant was not able to positively identify the occupant of the vehicle. Additional review of the pole camera footage, however, confirmed CONCEPCION at **Premise 1** during the morning and early afternoon hours of April 1, 2017. CONCEPCION was attired in white and black jacket consistent in design with the occupant that was partially obscured exiting the Ford Expedition on the previous night.

27.     On April 7, 2017, at approximately 10:45 a.m., your affiant was reviewing pole camera footage of a camera in the vicinity of **Premise 1**. At approximately 11:00 a.m. on the same day, SA Sabatino Smith completed a drive-by of **Premise 1** and observed CONCEPCION walking from **Premise 1** to **Vehicle 2** that was parked on the street. CONCEPCION was wearing a brown top and red pants.

28.     On this same day, agents followed **Vehicle 2** and a white Chevrolet Impala bearing Illinois Registration E73-9547, and determined to be a rental vehicle registered to Hertz Vehicles, LLC, (hereafter the "Chevy Impala"). **Vehicle 2** and the Chevy Impala drove in tandem to Lyell Avenue, Rochester, New York, where Task Force Agent Joseph Molzen observed CONCEPCION exit the Chevy Impala and enter the driver's side of

–21–

**Vehicle 2**. Agents continued surveillance on the **Vehicle 2** and observed CONCEPCION utilize **Vehicle 2** to meet with three unknown individuals on Sawyer Street and Flint Street in Rochester, New York. On each of these occasions, the unknown individuals approached **Vehicle 2**, entered **Vehicle 2**, and departed **Vehicle 2** while **Vehicle 2** remained stationary. After these three meetings, agents observed **Vehicle 2** travel to a Bank of America located on Park Avenue, Rochester, New York, where SA Sabatino Smith observed Tigist DEMISSIE, a previously identified co-conspirator, exit **Vehicle 2** and enter the Bank of America. Information obtained from Bank of America on April 9, 2017, confirmed that DEMISSIE deposited $1,400.00 U.S. currency during the transaction observed on April 7, 2017. Agents continued surveillance of **Vehicle 2** and observed **Vehicle 2** return to **Premise 1**. Agents utilized pole camera footage to monitor CONCEPCION and DEMISSIE enter **Premise 1**, and surveillance was discontinued.

29.     On April 8, 2017, SA Smith received information from CS-1 that CONCEPCION was in Rochester, New York, on the previous day in order to receive drug proceeds from co-conspirators from prior drug transactions that CONCEPCION had provided them on consignment. CS-1 also stated that CONCEPCION was obtaining orders for additional cocaine and heroin with plans to supply these co-conspirators at a later date.

30.     On May 4, 2017, at approximately 7:25 p.m., SA Smith was reviewing pole camera footage of a camera placed in the vicinity of **Premise 1** and observed **Vehicle 2** parked in the driveway. At approximately 7:30 p.m. on the same day, surveillance was established in the vicinity of **Premise 1**. Over the next several hours, agents observed

individuals arrive at **Premise 1**, park their vehicle and then go inside the residence. After 15-30 minutes these individuals would depart the location and drive away. This traffic is consistent with narcotics customers arriving to a location for the purpose of purchasing drugs. During this time frame, CS-1 contacted GRANET Investigator Genier and stated to GRANET Investigator Genier that he/she observed CONCEPCION in possession of over 100 grams of heroin inside **Premise 1**. The CS further stated that CONCEPCION was adding diluents to the heroin and packaging it for distribution. At approximately 12:06 a.m. on May 5, 2017, agents observed **Vehicle 2** depart **Premise 1**. Surveillance was continued on **Vehicle 2** and **Vehicle 2** was observed traveling to a hotel in Rochester, New York, then to Tyler Street where it was observed parked in the middle of the street in close proximity to **Premise 2** for approximately 10 minutes, and then back to the same hotel.

## Installation and Monitoring of GPS Tracking Device on Vehicle 2

31.    On May 5, 2017, SA Smith installed a court-authorized GPS tracking device on **Vehicle 2** in Rochester, New York. Since the installation of the tracking device, agents have observed CONCEPCION operate **Vehicle 2** and have been monitoring the activities of **Vehicle 2**. While monitoring the GPS tracking device on **Vehicle 2**, agents have observed **Vehicle 2** travel to **Premises 1 and 2** on multiple occasions.

32.    Additionally, your affiant reviewed the GPS tracking device information and observed **Vehicle 2** travel to **Premise 2** on multiple occasions. Specifically, on May 7, 2017, **Vehicle 2** traveled to **Premise 2**, where it remained between 3:59 a.m. and 4:26 a.m. before making a two-minute stop in a Dunkin' Donuts parking lot and a five-minute stop in a

–23–

McDonalds lot on its way to **Premise 1**. **Vehicle 2** arrived at **Premise 1** at approximately 4:46 a.m. and remained until 1:00 p.m. Based on my training and experience, your affiant has known drug dealers to often make frequent stops and utilize crowded public parking lots in order to meet with co-conspirators and to avoid detection from law enforcement. Your affiant has also known drug dealers to complete transactions at all hours of the day and night.

33.     Additionally, your affiant reviewed pole camera footage of **Premise 1** and the GPS tracking device of **Vehicle 2** for the date of May 24, 2017, and observed CONCEPCION depart the vicinity of **Premise 1** in **Vehicle 2**. **Vehicle 2** departed **Premise 1** at approximately 6:17 p.m., stopped in the vicinity of a clothing store in Rochester, New York, and then arrived in the vicinity of **Premise 2** at approximately 6:44 p.m. **Vehicle 2** remained in the vicinity of **Premise 2** until approximately 6:27 p.m. on May 25, 2017. SA William Reichard completed a drive-by on Tyler Street at approximately 9:30 a.m. on May 25, 2017, and observed **Vehicle 2** parked on the south side of the street across from **Premise 2**.

34.     Between May 27, 2017, at approximately 1:18 p.m., and May 31, 2017, at approximately 6:52 p.m., a review of the GPS tracking device showed that **Vehicle 2** remained stationary in the vicinity of **Premise 2**. Specifically, the data showed that **Vehicle 2** was likely in a garage at the end of the driveway behind **Premise 2**. On May 30, 2017, and again on May 31, 2017, SA Mahaffy completed drive-bys of **Premise 2** and observed the garage doors closed. On both occasions, SA Mahaffy observed a white Chevrolet

Tahoe, New York registration GZK-8615, parked in front of the garage of **Premise 2**. This vehicle was previously determined to be registered to Nathaniel GATES, 713 Main Street, Dunkirk, New York (hereafter "GATES' Chevy Tahoe").[8]  Your affiant did not include all trips to **Premise 2** observed during the monitoring of the GPS tracking device in this affidavit.

35.    An additional review of the GPS tracking device on **Vehicle 2** showed that **Vehicle 2** traveled to **Premise 1** on June 1, 2017, between approximately 5:26 a.m. and 5:32 a.m.  **Vehicle 2** then traveled directly to **Premise 2**, arriving at approximately 5:43 a.m. **Vehicle 2** departed **Premise 2** at approximately 5:47 a.m. and traveled directly to the vicinity of 9718 Hanberry Boulevard, Charlotte, North Carolina, arriving at approximately 6:22 p.m. on June 1, 2017.  HSI SA James Bryant had previously confirmed this residence to be associated with Tigist DEMISSIE (hereafter "DEMISSIE's Charlotte residence"). Additional review of the GPS tracking device on **Vehicle 2** showed that **Vehicle 2** departed DEMISSIE's Charlotte residence at approximately 8:52 p.m. on June 1, 2017, and traveled to the Atlanta, Georgia area, arriving at approximately 1:29 a.m. on June 2, 2017.  After making multiple stops in Atlanta, Georgia, **Vehicle 2** departed at approximately 10:53 p.m. on June 2, 2017.  At approximately 2:00 p.m. on June 3, 2017, agents executed a vehicle stop in the area of exit 46 on the New York State Thruway.  DEMISSIE was taken into custody and transported to the DEA Rochester Resident Office.

36.    On June 3, 2017, at approximately 3:14 p.m., SA Sabatino Smith and your

---

8    SA Mahaffy had previously observed GATES' Chevy Tahoe parked in the driveway of **Premise 1** on March 24, 2017.

affiant interviewed DEMISSIE at the DEA Rochester Resident Office.  SA Smith advised DEMISSIE of her Miranda rights utilizing a DEA Form 13A card. DEMISSIE answered SA Smith that she understood her rights and she agreed to answer the agent's questions. DEMISSIE originally told agents that she drove directly from Charlotte, North Carolina with a final destination of Rochester, New York.  When she was questioned about the fact that she was observed in Atlanta, Georgia, DEMISSIE changed her statement and acknowledged that she was in Atlanta, Georgia with Kevin CONCEPCION.  She further stated that she did not know of any drugs in **Vehicle 2**, but that there was a marijuana blunt inside the vehicle.    DEMISSIE  further  stated  she  has  made  bank  deposits  for CONCEPCION and that she did this because it looked better since she was employed. When questioned about the current location of **Vehicle 1**, DEMISSIE refused to provide the information.

## CONCLUSION

37.    WHEREFORE, based upon all of the foregoing, your affiant has probable cause to believe that the items listed in the annexed Schedule of Items to be Seized, which is incorporated by reference as if fully repeated here, are presently concealed and will be found in each of the Subject Premises 1 – 2, as well as Subject Vehicles 1-2, and that those items are contraband, evidence, records, fruits and instrumentalities of violations of Title 21, United States Code, Section 846 (conspiracy to commit a controlled substance offense), Title 18, United States Code, Sections 1956(h) and 1957 (money laundering offenses), and Title 18, United States Code, Section 924(c) (Unlawful possession of a firearm in furtherance of a drug trafficking crime).

38.     WHEREFORE, based upon the foregoing, I respectfully submit that there is probable cause to believe that between in or about September 2016 and on or about June 3, 2017, TIGIST DEMISSIE has conspired to distribute heroin and cocaine, in violation of federal law as enumerated in Title 21, United States Code, Section 846, and it is respectfully requested that the Court issue a complaint against TIGIST DEMISSIE, for this criminal offense.

CHRISTOPHER MAHAFEY
DEA SPECIAL AGENT

Subscribed and sworn to before
me this __3__ day of June, 2017 at __7:48 P__.m. * 11:05 PM

HONORABLE JONATHAN W. FELDMAN
UNITED STATES MAGISTRATE JUDGE

* Revised, but mistakenly not signed.

–27–

# EXHIBIT 1

1/19/2017



D-55 - XProtect® Web Client 2016 R2

1/19/2017

Menu

D-55 Rochester Salisbury St

D-55



Playback

D-55 - XProtect® Web Client 2016 R2

# EXHIBIT 2

Menu

Home > Private > Cameras > D-55



Menu

Home 〉 Private 〉 Cameras 〉 D-55



Playback

Menu

Home > Private > Cameras > D-55



Playback